**Jose Martinez HIGH,**
**Petitioner-Appellee,**
**Cross-Appellant,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center,**
**Respondent-Appellant, Cross-Appellee.**

No. 85–8989.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1987.

Mary Beth Westmoreland, William B. Hill, Jr., Asst. Attys. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Bradley S. Stetler, Office of Public Defender, Burlington, Vt., Michael C. Garrett, Augusta, Ga., for petitioner-appellee, cross-appellant.

Before GODBOLD, HILL and ANDERSON, Circuit Judges.

HILL, Circuit Judge:

Defendant Jose Martinez High brought this federal habeas corpus petition challenging his incarceration by the state of Georgia. High was convicted in 1978 of murder, kidnapping (2 counts), armed robbery, possession of a firearm during the commission of a crime, and aggravated assault; he received a sentence of death for armed robbery, murder, and two counts of kidnapping. On direct appeal, the Georgia Supreme Court vacated the death penalty for armed robbery and kidnapping; the conviction for aggravated assault was also reversed. *High v. State*, 247 Ga. 289, 276

S.E.2d 5 (1981), *cert. denied,* 455 U.S. 927, 102 S.Ct. 1290, 71 L.Ed.2d 470 (1982). The Georgia Supreme Court rejected High's further challenges to his conviction and sentence of death raised in a state habeas corpus attack. *High v. Zant,* 250 Ga. 693, 300 S.E.2d 654 (1983), *cert. denied,* 467 U.S. 1220, ·104 S.Ct. 2669, 81 L.Ed.2d 374 (1984). High sought federal habeas corpus relief in the United States District Court for the Southern District of Georgia. The district judge concluded that High's death sentence should be set aside due to the jury instructions given at the sentencing phase, 623 F.Supp. 316. Therefore, the writ was conditionally granted subject to the state's right to retry defendant on the question of sentence. The writ was denied in all other respects.

Relying upon our decision in *Spivey v. Zant,* 661 F.2d 464 (5th Cir.Unit B 1981), the district court concluded that the jury had not been adequately instructed concerning the nature and function of mitigating circumstances at the sentencing phase of High's trial. For the reasons set out below, we conclude the district court was in error on this issue. High asserts five other constitutional claims: (1) that the prosecutor used preemptory strikes in violation of the fourteenth amendment; (2) that the execution of a defendant under age eighteen at the time of the offense constitutes cruel and unusual punishment; (3) that High was denied effective assistance of counsel; (4) that the jury instructions improperly shifted the burden of proof as to intent; and (5) that various comments made by the prosecutor denied High a fundamentally fair trial.

Jose High and his accomplices, Nathan Brown and Judson Ruffin, robbed a service station in a rural Georgia community on July 26, 1976. The station operator (Henry Lee Phillips) and his eleven-year-old stepson (Bonnie Bullock) were abducted during the course of the robbery. Phillips was placed in the trunk of Ruffin's car; Bonnie Bullock was placed in the back seat. High and his accomplices drove the two to a remote site where they were to be eliminated. The eleven-year old was taunted by High as they rode in the back seat of the car: "Are you ready to die? Do you want to die? Well, you're going to die." The child begged for his life. Upon reaching a deserted wooded area, the victims were forced to lie face down in front of the car. The victims were then shot by the three defendants. Bonnie Bullock died of a bullet wound to the head. Phillips suffered a gun shot wound to the head and wrist. Having been left for dead, Phillips miraculously survived and later identified High, Ruffin, and Brown. High later confessed to the murder.

## I. ADEQUACY OF THE JURY INSTRUCTIONS CONCERNING THE NATURE AND FUNCTION OF MITIGATING CIRCUMSTANCES

High contends that the jury instructions given at the sentencing phase of his trial failed to apprise the jury of the nature and function of mitigating circumstances. In *Spivey v. Zant,* 661 F.2d 464 (5th Cir. Unit B 1981), this court held that failure to mention and define mitigating circumstances in a capital case violates constitutional requirements. The court noted that the jury must be explicitly instructed concerning mitigating circumstances. The court established the following standard in evaluating jury instructions:

> So long as the instruction clearly communicates that the law recognizes the existence of circumstances which do not justify or excuse the offense, but which, in fairness or mercy, may be considered as extenuating or reducing the degree of moral culpability and punishment ..., this portion of the constitutional requirement is satisfied.

*Id.* at 471 n. 8. The *Spivey* court, however, recognized that in certain circumstances the jury's discretion could be guided "without explicitly defining the nature and function of mitigating circumstances." *Id.* at 471. In *Dix v. Kemp,* 763 F.2d 1207, 1209 (11th Cir.1985), a panel of this court expanded the holding of *Spivey;* the court stated: "The words 'mitigating circumstances,' while they have meaning to most jurors, still do not adequately communicate the precise nature or function of that con-

cept in the context of a sentencing trial." A similar result had been reached by the court in *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir.1983). High rests his argument upon this line of cases. The *Westbrook* decision and it progeny was significantly restricted by this court's *en banc* consideration of this issue in *Peek v. Kemp,* 784 F.2d 1479 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). In this decision, the court reaffirmed the rationale of *Spivey v. Zant* but held that a jury instruction indistinguishable from the instructions challenged in *Westbrook* did sufficiently instruct the jury as to the nature and function of mitigating circumstances. The *Peek* decision requires that jury instructions be viewed in the context of the entire sentencing proceeding. The standard of review is whether any "reasonable juror could have failed to understand the challenged instructions and the role of mitigation." *Peek,* 784 F.2d at 1486; *see also Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 1975 n. 8, 85 L.Ed.2d 344 (1985) (indicating that appropriate standard is whether "there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law").

The district court's decision to grant High's writ of habeas corpus is understandable in light of the fact that the *Peek* decision was not rendered until four months after the district court's ruling. An evaluation of the instruction given at High's trial, however, reveals that the instructions sufficiently informed the jury as to the nature and function of mitigating circumstances. At the commencement of the sentencing phase, the trial judge informed the jury that "both the state and the defendant have the right to offer or proffer any evidence that they see fit." Transcript at 907. The effect of this instruction is to inform the jury that it may consider all evidence presented without restriction. At the very outset of the sentencing charge, the jury was instructed: "you are authorized to consider all of the evidence received by you in open court in the first phase of the trial, including all mitigating facts and circumstances, if any, on behalf of the defendant." Transcript at 925–26. Not only was the jury instructed that it was to consider mitigating facts, but this sentence clearly links mitigating facts with the defendant. Giving this charge a common sense evaluation, it is clear that the jury was aware that "mitigating facts" are those facts which are "good" and tend to help the defendant. More precisely, when dressed in the terminology of attorneys, the jury was aware that it could consider facts which extenuate the degree of moral culpability. Again, the jury was instructed to consider mitigating circumstances: "you are authorized to consider all of the facts and circumstances of the case including mitigating facts and circumstances, if any, on behalf of the defendant." Trial Transcript at 927. Again, mitigating circumstances were linked with facts which would benefit the defendant as the jury considered the appropriateness of the death penalty for this particular defendant. Additionally, the court charged the jury that aggravating circumstances were to be proved beyond any reasonable doubt and set forth the two statutory aggravating factors which had been argued by the prosecutor. Finally, it is beyond question that the jury was instructed that it could impose mercy without regard to the mitigating or aggravating circumstances found: "I charge you, members of the jury, that if you find that the state has proved one or more statutory aggravating circumstances beyond a reasonable doubt that you may recommend that the defendant receive a life sentence." Transcript at 931.

The only distinguishing factor between the instructions given here and the instructions held to be adequate in the *Peek* decision is that the trial judge in *Peek* gave concrete examples of a mitigating and aggravating factor. Had this been done at High's trial, such an instruction would have emphasized the fact that there were no mitigating circumstances to be found. High presented no evidence at either the guilt or sentencing phase of his trial. High's closing argument at the sentencing phase makes a general plea for mercy; emphasis is placed upon biblical quotations and the fact that High's execution will not

bring back the victim. High, however, failed to come forward with any form of mitigating evidence. In this context, the jury instruction was sufficient to inform the jury adequately as to the nature and function of mitigating circumstances. We refuse to admonish the trial judge for wisely deciding not to belabor instructions on mitigation where the effect would have been to emphasize that there was no mitigating evidence on the defendant's behalf. As in *Peek*, we conclude that a common sense evaluation of the jury instruction reveals that the jury was sufficiently informed of its duty to consider mitigating evidence.

## II. RETROACTIVITY OF *BATSON V. KENTUCKY*

At High's trial, the prosecutor used nine of his ten preemptory challenges to strike blacks on the venire. On direct appeal to the Georgia Supreme Court, the court found that High was not denied due process of law due to the prosecutor's use of preemptory challenges to strike members of High's race. *High v. State*, 247 Ga. at 289, 276 S.E.2d at 8. The court relied upon *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (defendant must show systematic exclusion of racial group over a period of time to successfully attack prosecutor's use of preemptory challenges). The record shows that High could not have sustained a challenge to the makeup of his jury in light of the evidentiary requirements of *Swain*.

In 1982, High's direct appeal ended after the Georgia Supreme Court sustained his sentence of death and certiorari was denied by the United States Supreme Court. Over four years later, the United States Supreme Court rendered its decision in *Batson v. Kentucky*, — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This decision altered *Swain* and established that a prima facie case of racial discrimination could be established if a defendant proves: (1) the defendant is a member of a cognizable racial group; (2) the prosecutor used

preemptory strikes to remove members of the defendant's race from the venire; and (3) an inference may be found that the venirepersons were removed because of race. Defendant asserts that he has satisfied the elements set forth in *Batson*. In *Griffith v. Kentucky*, — U.S. —, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Supreme Court held that *Batson* should be applied retroactively with regard to cases pending on direct appeal. *See also United States v. David*, 803 F.2d 1567 (11th Cir. 1986). The *Batson* decision, however, does not apply retroactively to collateral attacks " 'where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed.' " *Allen v. Hardy*, — U.S. —, 106 S.Ct. 2878, 2880 n. 1, 92 L.Ed.2d 199 (1986) (per curiam) (quoting *Linkletter v. Walker*, 381 U.S. 618, 622 n. 5, 85 S.Ct. 1731, 1734 n. 5, 14 L.Ed.2d 601 (1965)); *see also Lindsey v. Smith*, 820 F.2d 1137 (11th Cir.1987).

■ The holding of the Supreme Court is clear and unambiguous:

[R]etroactive applications of the *Batson* rule on collateral review of final convictions would seriously disrupt the administration of justice. Retroactive application would require trial courts to hold hearings, often years after the conviction became final, to determine whether the defendant's proof concerning the prosecutor's exercise of challenges established a prima facie case of discrimination. Where a defendant made out a prima facie case, the court then would be required to ask the prosecutor to explain his reasons for challenges, a task that would be impossible in virtually every case since the prosecutor, relying on *Swain*, would have no reason to think such an explanation would someday be necessary.

*Allen v. Hardy*, 106 S.Ct. at 2281. In this collateral attack, High's claim based upon *Batson* is therefore without merit.[1]

---

1. Justice Powell, concurring in *Griffith*, expressed his view that Supreme Court decisions should be applied retroactively in all criminal prosecutions "with respect to cases pending at

## III. IMPOSITION OF DEATH PENALTY ON DEFENDANT UNDER AGE EIGHTEEN AT THE TIME OF THE OFFENSE

Jose High was seventeen years old at the time of the offense. In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the United States Supreme Court granted certiorari to consider whether the execution of a defendant under age eighteen at the time of the offense would constitute cruel and unusual punishment. Although this issue was not addressed in the final opinion in *Eddings*, Chief Justice Burger noted in his dissent: "The Court stops far short of suggesting that there is any constitutional proscription against imposition of the death penalty on a person who is under age 18 when the murder was committed." *Id.* at 128, 102 S.Ct. at 883.

■■■ In considering whether state action violates the eighth and fourteenth amendments, this court must evaluate the punishment in light of contemporary standards of decency. *See, e.g., Woodson v. North Carolina*, 428 U.S. 280, 288, 96 S.Ct. 2978, 2983, 49 L.Ed.2d 944 (1976) (plurality). Deference, however, will be given to the considered judgment of the state legislature as to what punishment is appropriate for a particular offense. *Gregg v. Georgia*, 428 U.S. 153, 174–75, 96 S.Ct. 2909, 2925–26, 49 L.Ed.2d 859 (1976) (plurality). The Georgia legislature has chosen to treat all persons seventeen years and older as an adult for purposes of criminal convictions. Ga.Code Ann. § 15–11–2(2) (1985). We are in agreement with the United States Court of Appeals for the Fifth Circuit on this issue: "Nothing in society's standards of decency compel more than

consideration of an eighteen year old's youth as a mitigating factor." *Prejean v. Blackburn*, 743 F.2d 1091, 1098 (5th Cir. 1984); *see also Thompson v. State*, 724 P.2d 780 (Okla.Crim.App.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 1284, 94 L.Ed.2d 143 (1987). The constitution does not prohibit a state from imposing the death penalty on one who, while seventeen years old, has intentionally and viciously taken a life in cold blood.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

At trial and during state appellate proceedings, High was represented by John Ruffin. Ruffin had twenty-one years of experience at the time of the trial; over twenty-five percent of his practice consisted of criminal law. Prior to High's case, Ruffin had handled at least twelve other capital cases. In two of these cases, the death penalty was sought. High contends that Ruffin's representation was constitutionally deficient.

The thrust of High's argument is that Ruffin failed to investigate sufficiently mitigating evidence. In support of this argument, High presented numerous affidavits from individuals setting forth their testimony and stating that they were not contacted by Ruffin at the time of the trial. Additionally, High points out that his age (seventeen) was never presented as a mitigating factor to the jury. The affidavits offered by the defendant add a human element to the story of the life of Jose High. The vast majority of these affidavits, however, may be characterized as lukewarm at best; frequently, the affiant appears to be straining to say something good about High. Several of these affidavits are inter-

---

the time on direct appeal and with respect to cases pending on habeas corpus petitions." *Griffith v. Kentucky,* —— U.S. ——, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (Powell, J., concurring). Specifically Justice Powell wrote:

As the cases we decided today involve only the retroactivity of decisions pending on direct review, it was not necessary for the court to express an opinion with respect to habeas corpus petitions. As I read the court's opinion, this question is carefully left open until it is squarely presented.

*Id.* at 716. Until such time as the Supreme Court may reexamine its opinion in *Allen v. Hardy,* we are bound by the Court's holding that *Batson* is not to be applied retroactively to pending federal habeas petitions. We read the majority decision in *Griffith* as leaving undisturbed the holding of *Allen v. Hardy.* The Supreme Court specifically chose to limit the *Griffith* holding to those cases "pending on direct review or not yet final." *Id.* at 716.

**994**

spersed with reference to High's association with gangs, problems High had in school, High's hostility toward whites, and High's lack of academic ambitions. Additionally, Ruffin testified that had this information been available to him, he would have declined to use at least one of the affiants (C.A. Reid) because of the individual's reputation in the community. Under these circumstances, this court would be hard pressed to find that High had made a sufficient showing of prejudice under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We need not resolve this issue, however, because we agree with the district court's holding that Ruffin rendered effective assistance of counsel.

■ The record indicates that Ruffin made a diligent effort to unearth mitigating evidence. Such was the holding of the Georgia superior court judge during High's state habeas corpus proceeding. We therefore give deference to this factual determination of the Georgia Superior Court. *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Ruffin had two law students assist him in uncovering evidence for both the guilt and sentencing phase. Ruffin asked High whether he could think of any witnesses who might testify at the sentencing phase. Although High's parents were never specifically asked whether they knew of persons who might be able to testify at sentencing, High's parents were asked whether they knew of any information that might be beneficial in preparing for trial. Ruffin testified that he made a tactical decision not to call High's parents to testify because of their emotional state. This court will not question the sound tactical decisions of the trial attorney. *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts ... are virtually unchallengable[.]")

■ We find persuasive Ruffin's testimony at the state habeas proceeding that it is not unusual for witnesses to emerge once a defendant has been convicted. Ironically, High appears to have had at least some difficulty in urging witnesses to prepare affidavits promptly for the state habeas proceeding. *See, e.g.*, Transcript of State Habeas Corpus Proceedings at 7–9. The evidence tends to show that the failure to present mitigating evidence was not due to constitutionally deficient investigation by Ruffin. Rather, the failure to present evidence was a result of the lack of mitigating evidence and the unwillingness of witnesses to make themselves available to testify in a helpful manner.

## V. INSTRUCTIONS CONCERNING PRESUMPTION OF INTENT

■ At the guilt phase of High's trial, the jury was instructed:

> I charge you that the acts of a person of sound mind and discretion are presumed to be the product of a person's will, but the presumption may be rebutted. I charge you that a person of sound mind and discretion is presumed to intend the natural and probable consequences of his act, but the presumption may be rebutted.

Trial Transcript at 882. Such an instruction impermissibly shifts the burden of proof upon the defendant in violation of the fourteenth amendment. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

■■ When a *Sandstrom* violation is established, the court must proceed to consider whether on the whole record the error was harmless beyond a reasonable doubt. *Rose v. Clark*, — U.S. —, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Dobbs v. Kemp*, 790 F.2d 1499 (11th Cir.1986); *Davis v. Kemp*, 752 F.2d 1515 (11th Cir. 1985) (per curiam). Applying the harmless error rule, we conclude that the instruction at issue was harmless beyond a reasonable doubt; the jury, having accepted the prosecution's version of the evidence, clearly would have found that the defendant intentionally killed the victim wherever the burden lay. Intent, quite simply, was never a contested issue in this trial.

The evidence shows that Bonnie Bullock was kidnapped in the course of an armed robbery. High repeatedly taunted the child by telling the child he was about to be killed. The victim was taken to a deserted area so that he could be killed without being observed. The victim was ordered to lie on the ground. The child was then killed by a gun shot to the head. As noted by the district court, there was never the slightest argument as to whether the gun had discharged accidentally. Nothing indicated that the murder was other than intentional. It would stretch the bounds of reason to conclude that the defendant lacked the requisite intent in light of the facts leading up to the child's death. High was not harmed by the *Sandstrom* error.

## VI. PROSECUTORIAL MISCONDUCT

■ Jose High assigns as error comments made by the prosecutor during closing arguments at the guilt determination phase. The prosecutor stated that High had committed three other murders in addition to the one murder for which he was being tried. This total argument was:

> There's going to be a state's Exhibit .21 here where this man was so proud of himself in killing these people—he killed four and a half, and the 'half' was one that was shot that didn't die.

Trial Transcript at 836. This argument was made without objection. The defendant's failure to object to this argument diminished the chances that the prosecutor would withdraw the statement or that the court would give a curative instruction. Although this failure to object does not conclusively resolve this issue on appeal, it remains a factor to be considered in determining whether the prosecutor's comments rendered the trial fundamentally unfair. *Brooks v. Kemp*, 762 F.2d 1383, 1397 n. 19 (11th Cir.1985).

High contends that the argument of the prosecutor was not a reasonable inference from the facts presented into evidence. The trial transcript of High's conviction shows otherwise.

The prosecutor's basis for making this statement was a confession made by High on August 29, 1976. During the course of the police investigation, High requested that he be interviewed by a well-known television personality. In anticipation of this interview, High prepared a set of questions which he wished to be asked of him. (State's Exhibit 21). One of these questions read: "How many people have family killed?" The police constructed a mock television studio at the sheriff's department and arranged for a local television announcer to interview High. During this mock television interview, High answered this question by stating that his "family" had killed 4½ persons, the half person being Henry Lee Phillips who survived after receiving a bullet wound to his temple. High's confession that his family had killed 4½ persons was related in court, but outside the presence of the jury, by Officer R.F. Ingram during voir dire at a hearing conducted for the purpose of satisfying the rule of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The aspect of High's confession concerning the 4½ persons killed was never presented before the jury.

■ The jury, however, was presented with ample evidence from which it could have concluded that High had committed numerous murders. The jury was informed that High had organized a group of persons which he dubbed his "family." High provided weapons to his family members and directed the commission of various crimes. Trial Transcript at 790. Officer Ingram testified before the jury as to the power which High claimed he wielded over this group:

> Mr. High stated that he was ringleader of a group of people, which he described the name of the group as being a family. He stated that he was the leader and organizer of this group which was not only in the state of Georgia but outside the state of Georgia.
>
> . . . .
>
> [H]e stated the name of the group was a family, which he was the leader and organizer of—that he had the power over the family members to get them to do whatever he wanted for them.

Trial Transcript at 787. The jury also had before it the list of questions which High wished to have asked during the interview. The fact that High wanted to be asked how many people his family had killed gives rise to a reasonable inference that High had committed several murders. Thus, the prosecutor's statement that High had killed 4½ persons was not materially different from the evidence presented. *Cf. Tucker v. Kemp,* 762 F.2d 1480, 1486–87 (11th Cir. 1985) (en banc), *vacated,* — U.S. —, 106 S.Ct. 517, 88 L.Ed.2d 452 (1986). Certainly, this statement was not so egregious as to render High's trial fundamentally unfair.[2]

High also argues that this statement constitutes an improper attempt to use his involvement in other crimes as evidence of guilt with regard to the offense charged. First, such an argument presents a question of Georgia evidentiary rules and cannot form a basis for relief in a federal habeas petition. Second, evidence of other crimes would have been harmless error with regard to the guilt phase in light of the overwhelming evidence against High. Third, evidence of other murders committed by High certainly would have been admissible during the sentencing phase.

We agree with the district court that the remaining prosecutorial arguments to which High objects did not render the trial fundamentally unfair. Accordingly, the decision of the district court granting High's petition for a writ of habeas corpus is

REVERSED and REMANDED.

---

2. Additionally, I note, but without the concurrence of my colleagues on this issue, that High was not prejudiced by the prosecutor's argument. *The state, not the defendant, was harmed* by the prosecutor's failure to present into evidence the precise statement High made concerning the 4½ murders. *Had the prosecutor not been guilty of this oversight,* the jury would have heard that High wanted to be interviewed by a nationally known television personality so that he could boast of killing 4½ persons. Instead, the only thing the jury heard was that High wanted the interview and, in it, to be asked how many murders he had committed, supplemented by the prosecutor's one sentence summary of the entire confession.

The prosecutor's statement was not nearly as damaging to High as would have been the evidence which constitutionally could have been admitted against him. In the total trial, therefore, the petitioner was subjected to less damning attack than the constitution would have allowed. Any relief granted to the petitioner on account of the unsupported statement made by the prosecutor would not have resulted in eliminating the statement at a retrial. Were this court to grant the writ, on retrial the prosecutor could display to the jury High's boastful statement in its entirety. Thus, the defendant was not prejudiced by the sequence of events of which he now complains.

As stated, Judges Godbold and Anderson do not join in my statement in this marginal note.