James CUNNINGHAM, Jr.,
Plaintiff–Appellee,
Cross–Appellant,

v.

Walter ZANT, Warden, Georgia Diagnostic and Classification Center,
Respondent–Appellant, Cross–Appellee.

No. 90–8165.

United States Court of Appeals,
Eleventh Circuit.

March 27, 1991.

Dennis R. Dunn, Asst. Atty. Gen., Mary Beth Westmoreland, Atlanta, Ga., for respondent-appellant, cross-appellee.

August F. Siemon, Frank L. Derrickson, Atlanta, Ga., for plaintiff-appellee, cross-appellant.

Before TJOFLAT, Chief Judge, and JOHNSON and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge:

The respondent Walter Zant appeals the district court's order granting habeas relief and vacating the petitioner's death sentence on the grounds that the trial court's jury charge during the sentencing phase was constitutionally inadequate. Petitioner James Cunningham, Jr., cross-appeals the denial of his claims that his grand and petit juries were unconstitutionally composed, that the trial court's charge during the guilt phase unconstitutionally shifted the burden of proof to the defendant, and that the performance of his counsel during the sentencing phase of the trial violated his right to effective assistance of counsel.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

William B. Crawford lived in the back of his store in Lincolnton, Georgia. Cunningham often bought produce from Crawford. On the evening of January 1, 1979, Crawford's neighbor, Mary Alice Tutt, went to Crawford's store and found Crawford lying on the floor, apparently dead, and called the police. An autopsy conducted the next day revealed that Crawford had been severely beaten around the head and killed with a blunt instrument. The director of the state crime laboratory, Dr. Larry Howard, testified at trial that there had been at least eighteen blows to Crawford's head and arms and that the cause of death was multiple blows to the skull. There had been at least eight blows directly to the head, any one of which could have been fatal. Dr. Howard opined that Crawford's arms had been injured while trying to protect his head from being beaten.

At approximately 1:30 a.m., on the morning after Crawford's death, Cunningham paid Alex Williams to give Cunningham and his family a ride to the Augusta Trailways bus station. At the station, Cunningham purchased tickets to Newark, New Jersey, for himself and his family and boarded a bus.

When Williams learned of the victim's death the next day, he became suspicious and contacted the Sheriff's office. Williams explained to the Sheriff that he had given Cunningham a ride to the Augusta Trailways station the night before. The Georgia Bureau of Investigation ("G.B.I.") then contacted the police in Durham, North Carolina, who detained Cunningham when the bus stopped there. After being advised of his *Miranda* rights, Cunningham signed a waiver of those rights and consented to talk with the police. He initially stated that he had seen two white males near Crawford's house, but gave no indication that he had been involved in the killing. Detective Franklin then placed Cunningham in a cell, provided him with a meal, and allowed him to take a nap.

Approximately four hours later, the Durham police again sought to interview Cunningham. They again advised Cunningham of his *Miranda* rights, and Cunningham again signed a written waiver of those rights. During the course of this interview, Cunningham provided a statement, written by Detective Franklin, in which he admitted that he had gone to Crawford's store to purchase cigarettes and that he hit Crawford at least nine times with a wrench he had brought along after Crawford refused to let him buy the cigarettes on credit. Cunningham stated that he had not wanted to kill Crawford. Rather, he had only wanted to knock Crawford out. He further claimed that he had wanted the money only to make a payment on his mortgaged trailer which he was afraid that he was going to lose.

After being advised that Cunningham had been arrested, two G.B.I. agents traveled to Durham, North Carolina. After advising Cunningham of his *Miranda* rights, these agents took an additional statement from Cunningham, which was tape-recorded, in which Cunningham reiterated his prior admission. After being extradited to Georgia, Cunningham made an additional statement in which he revealed where he had hidden the murder weapon, his clothing and Crawford's wallet. On January 12, 1979, Cunningham made another statement which reiterated the same facts of the crime, but added that his wife had planned the robbery. After conducting a *Jackson v. Denno* hearing,[1] the trial court found that Cunningham had given all of these statements freely and voluntarily and admitted the statements into evidence.

### B. *Procedural History*

On January 22, 1979, Cunningham was indicted for burglary, armed robbery, and malice murder. After a trial on October 23–24, 1979, the jury found Cunningham guilty of armed robbery and malice murder. The charge of burglary was *nol prossed.* After the sentencing phase of the trial, the jury found the existence of the second and the seventh aggravating circumstances as to both offenses pursuant to Ga.Code Ann. § 17–10–30(b)(2) & (b)(7) and recommended that Cunningham be sentenced to death on both convictions.

Cunningham appealed his convictions and sentences to the Supreme Court of Georgia which affirmed the convictions and the death sentence for malice murder, but vacated the death sentence for armed robbery. *Cunningham v. State,* 248 Ga. 558, 284 S.E.2d 390 (1981). Cunningham's motion to the Georgia Supreme Court for rehearing was denied as was his application for a writ of certiorari from the United States Supreme Court. *Cunningham v. Georgia,* 455 U.S. 1038, 102 S.Ct. 1741, 72 L.Ed.2d 155 (1982). On June 30, 1982, he filed an application for state habeas relief which, after an evidentiary hearing and oral argument, was denied. *Cunningham v. Kemp,* No. 5598 slip op. at 60 (Ga.Superior Ct.1988). The Supreme Courts of Georgia and the United States denied Cunningham's application for review of this decision.

---

**1.** In *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Supreme Court held that the trial judge must determine, at a separate hearing, that a confession is voluntary before it may be heard by a jury. *See also Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

On July 5, 1989, Cunningham filed an application for a writ of habeas corpus in the district court. Cunningham argued that the trial court's jury instructions at both the guilt-innocence phase and the sentencing phase contained reversible errors. He further argued that he received ineffective assistance of counsel during the sentencing phase of his trial and that the grand and petit juries which indicted and convicted him were unconstitutionally composed. The district court held that the trial court had committed error in its sentencing phase instructions, but found Cunningham's other claims to be meritless. The court therefore vacated Cunningham's death sentence and ordered that he be resentenced within 180 days of the date of its order. This appeal and cross-appeal followed.

## II. ANALYSIS

When reviewing a district court's grant of habeas corpus relief, this Court will not disturb the court's factual findings unless clearly erroneous. *Baty v. Balkcom,* 661 F.2d 391, 394 n. 7 (5th Cir. Unit B 1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).[2] Review of questions of law and of mixed questions of law and fact is plenary. *Id.* State factual findings, including implied findings of fact, are entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d) (West 1977). *Marshall v. Loneberger,* 459 U.S. 422, 433, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983).

### A. *Sentencing Phase Jury Instructions on Mitigation*

The trial court orally charged the jury that it was "authorized to consider all of the evidence received by you in open court in both phases of the trial, including all mitigating and/or extenuating facts and circumstances, if any on behalf of the defendant." It did not define mitigating or extenuating. The trial court later repeated the instruction "to consider all of the evidence," but did not mention mitigating or extenuating facts. The trial court then proceeded to instruct the jury as to aggravating circumstances, but gave the jury no oral charge instructing that it could recommend a life sentence even if the state proved the existence of one or more aggravating circumstances beyond a reasonable doubt.

The district court found that the trial court's oral charge on mitigating circumstances was constitutionally deficient because it did not adequately explain the meaning and function of mitigating circumstances and it did not instruct the jury that it could still recommend a life sentence even if the state proved beyond a reasonable doubt the existence of one or more aggravating circumstances. The court acknowledged that the written charge that was submitted properly contained these instructions. It concluded, however, that the jury had no reason to look at the written charge because the oral charge suggested that the written charge would be identical to the oral charge.

The state argues that the trial court's oral charge is virtually identical to the charge this Court held constitutional in *High v. Kemp,* 819 F.2d 988 (11th Cir.1987), *cert. denied,* 492 U.S. 926, 109 S.Ct. 3264, 109 L.Ed.2d 609 (1989). Moreover, the state contends that once the written instructions are considered there is no reasonable possibility that a juror could have misunderstood the meaning and function of mitigating circumstances.[3]

A jury charge on mitigating circumstances is constitutionally valid if there is "no reasonable possibility that a juror will misunderstand the meaning and function of

**2.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this Court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

**3.** The state's argument that an adverse inference should be drawn from the fact that Cunningham made no objection to the trial court's charge has no merit. The Georgia Supreme Court has held "that defendants in criminal cases are not required to except to the jury charge to preserve error for appeal" or for habeas review. *Stynchombe v. Floyd,* 252 Ga. 113, 311 S.E.2d 828, 830 (1984).

mitigating circumstances." *Peek v. Kemp*, 784 F.2d 1479, 1494 (11th Cir.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). The charge must be viewed as a whole and in the context of the entire sentencing proceeding. *See High*, 819 F.2d at 991.

 The oral charge in the instant case is significantly different from the oral instructions found constitutional in *High*. In *High*, 819 F.2d at 991, this Court specifically noted that the challenged instruction orally charged the jury that it could recommend a life sentence even if the state had proven one or more aggravating circumstances beyond a reasonable doubt. The oral charge in the instant case provided no such instruction. The oral charge did instruct the jury that it could recommend a life sentence, but this was unrelated to the charge on aggravating circumstances.

 Furthermore, in *High* the petitioner failed to present any mitigating evidence. This Court refused to reproach the trial judge for "deciding not to belabor instructions on mitigation where the effect would have been to emphasize that there was no mitigating evidence on the defendant's behalf." *High*, 819 F.2d at 992. Unlike the petitioner in *High*, Cunningham presented mitigating evidence including his own testimony and the testimony of his employer. Where a defendant has specifically presented mitigating evidence, the absence of any explanatory instructions on mitigation creates a reasonable possibility that the jury misunderstood the meaning and function of the mitigating evidence in the sentencing deliberations.[4] Moreover, although the

written instructions adequately explained mitigation, after reviewing the oral charges, we concur with the district court's determination that the jury had no reason to look at the written charge because the trial court had orally instructed the jury that the written charge was the same as the oral charge.[5]

 The state argues that the Georgia Supreme Court and the state habeas court made implicit factual findings that the jury had considered the written charge. It contends that these implicit findings are binding on the federal courts pursuant to 28 U.S.C.A. § 2254(d) (West 1977). *See Marshall*, 459 U.S. at 433, 103 S.Ct. at 850. Our reading of the Georgia Supreme Court's opinion as well as the state habeas court's final order reveals, however, that those courts found only that the charges as a whole, written combined with oral, met constitutional requirements. Neither the Georgia Supreme Court nor the state habeas court directly addressed the question of whether the jury actually read the written charge. *See Cunningham v. State*, 284 S.E.2d at 396–97; *Cunningham v. Kemp*, No. 5598 (slip op. at 34–35) (May 31, 1988). The Supreme Court has stated "that factfinding procedures aspire to a higher standard of reliability" in capital cases. *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) (plurality). Accordingly, this Court will not infer an implicit finding that the jury consulted the written charge from the Georgia Supreme Court's and the state habeas court's finding that the entire charge, written as well as oral, was constitutionally sufficient.

---

**4.** Moreover, the charge found constitutional in *Peek* is substantially different from the charge in the instant case. In *Peek*, 784 F.2d at 1490–91, the charge provided an example of a mitigating circumstance, *e.g.*, the absence of a criminal record. The charge in the instant case provided no example of a mitigating circumstance.

**5.** As the bailiff was handing the jurors the written charge and a written verdict form, the trial court informed the jurors that these written instructions were given to them for their convenience. The court did not instruct the jurors that they *had* to consult these written instructions but only stated that *if* the jurors consulted the instructions then the written instructions

and written verdict form would govern the verdict. Moreover, the trial court provided the jurors with oral and written instructions on how to complete the verdict form. Nevertheless, when the jury initially returned with a verdict, the court found the jury had incorrectly filled out the verdict form, despite the written instructions, and the court again orally instructed the jury on how to fill out the verdict form. The jury's failure to follow the written instructions regarding the verdict form lends substantial inferential support to the district court's conclusion that the jury did not consult the written instructions regarding mitigating evidence.

## B. Unconstitutional Jury Composition

Cunningham alleges that the venire from which his grand and petit jury were drawn was unconstitutionally composed because both women and African–Americans were underrepresented by seventeen percent and fourteen percent, respectively.[6] Cunningham contends that this underrepresentation violates the fair cross-section requirement of the Sixth Amendment and the Equal Protection Clause of the Fourteenth Amendment. The district court held that Cunningham failed to make out a prima facie violation of either the Sixth Amendment or the Fourteenth Amendment.[7]

Discriminatory selection of a jury venire may be challenged under the Sixth Amendment's requirement that the venire reflect a fair cross-section of the community. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). To establish a prima facie violation of the fair cross-section requirement, a petitioner must show (1) that the group underrepresented is a distinctive group in the community,[8] (2) that the underrepresentation in the venire is not fair and reasonable in relation to the group's number in the community, and (3) that this underrepresentation is due to systematic exclusion of the group from the selection process. *Duren,* 439 U.S. at 364, 99 S.Ct. at 668. Cunningham has met the first element of the prima facie case for a fair cross-section challenge. Women and African–Americans are distinctive community groups within the meaning of *Duren. See Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

The jury pools from which Cunningham's grand and petit jury were selected were formed in accordance with an or-der entered in 1973 by United States District Judge Anthony Alaimo. *Twilight Improvement Ass'n v. Jury Comm'n of Lincoln County,* No. 1658, slip op. at 1–2 (D.Ga.1973). This order required the Lincoln County Jury Commissioners to select petit jury pools by picking every fifth name from the voter registration list and to create grand jury pools by choosing every third name from the petit jury list. Cunningham has submitted no evidence that the voter list from which these jury pools were selected has been tampered with in any way. There is also no evidence that jury pools selected in accordance with the federal order regularly or consistently contained a significant underrepresentation of any group. *Compare Duren,* 439 U.S. at 366, 99 S.Ct. at 669 ("a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year"). Accordingly, Cunningham has failed to establish the third element of a prima facie case because he has not shown that the "underrepresentation is due to systematic exclusion of the group[s] in the jury-selection process." *Duren,* 439 U.S. at 364, 99 S.Ct. at 668.

Discriminatory selection of a jury venire may also be challenged under the Equal Protection Clause of the Fourteenth Amendment. *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). To establish a prima facie claim for an equal protection violation, a petitioner must show (1) that he or she is a member of a group capable of being singled out for discriminatory treatment, (2) that members of this group were substantially underrepresented on the venire, and (3) that the venire was selected under a practice providing an opportunity for discrimination. *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280.

---

6. These figures represent the absolute disparity between the percentages of women and African–Americans above the age of eighteen in the general population and on the venire.

7. The state argued before the district court that Cunningham had waived his right to challenge the grand jury pool because he did not timely raise this issue. The district court found it unnecessary to determine whether the grand jury claim was timely raised because the court determined that Cunningham was not entitled to relief on the merits of his claim.

8. A criminal defendant has standing to present a fair cross-section challenge whether or not he or she is a member of the excluded class. *Duren,* 439 U.S. at 359 n. 1, 99 S.Ct. at 666 n. 1.

**1014**

 It is undisputed that the jury pools were selected in accordance with Judge Alaimo's order. Moreover, by requiring that jury commissioners select every fifth name from the voter registration list, Judge Alaimo's order ensured that selection would be entirely random and free of any opportunity for discrimination. Because Cunningham has failed to show that the venire was selected under a practice that provides an opportunity for discrimination, Cunningham's equal protection claim is also meritless.[9]

### C. Jury Charge on Intent

 Cunningham argues that he is entitled to a new trial because the trial court improperly charged the jury during the guilt phase that it could presume his intent to kill. Without conceding that the charge was unconstitutional, the state argues that the district court correctly determined that any error was harmless beyond a reasonable doubt.[10]

 A jury charge which shifts the burden of proof on the issue of intent from the government to a defendant is unconstitutional. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). A conviction based on a *Sandstrom* violation may be upheld, however, if the error is harmless beyond a reasonable doubt. *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). This Court recognizes a *Sandstrom* error as harmless in two situations: "(1) where the erroneous instruction was applied to an element of the crime that was not at issue in the trial, or (2) where the evidence as to defendant's guilt was overwhelming." *Bowen v. Kemp*, 832 F.2d 546, 548 (11th Cir.1987) (en banc), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988).

 There can be little doubt that the charge on intent was unconstitutional under *Sandstrom, supra*, and *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).[11] Accordingly, in order to ascertain whether the *Sandstrom* error was harmless, this Court must determine whether intent was at issue at the trial and, if so, whether evidence at trial overwhelmingly showed intent to kill.

"Both intent and malice are essential elements of the crime of murder in Georgia." *Stephens v. Kemp*, 846 F.2d 642, 659 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). Failure to dispute an essential element of the crime does not automatically remove the issue

---

**9.** Citing *Castaneda*, 430 U.S. at 494–95, 97 S.Ct. at 1280–81, Cunningham argues that a prima facie equal protection violation may be established solely by showing underrepresentation. Cunningham has misread *Castaneda*. In *Castaneda*, the defendant presented evidence that showed that over an eleven-year period Mexican–Americans had been underrepresented on grand juries by forty percent. *Id.* at 495, 97 S.Ct. at 1280. Thus, *Castaneda* stands for the principle that an equal protection violation in jury selection may be established by a statistical showing that a distinctive group has been substantially underrepresented on the venire *over a period of time*. *See Batson v. Kentucky*, 476 U.S. 79, 95, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1986) (explaining the elements of a prima facie case set forth in *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280). A defendant may still establish that the particular venire from which his jury was drawn violated the equal protection clause " 'in other ways than by evidence of long-continued unexplained' [underrepresentation] of members of his race 'from many panels.' " *Id.* (quoting *Cassell v. Texas*, 339 U.S. 282, 290, 70 S.Ct. 629, 633, 94 L.Ed. 839 (1950) (plurality)). Absent evidence of systematic long-term under-representation, a defendant may establish a prima facie case upon a showing that members of his or her race were substantially underrepresented from the particular venire from which the jury was drawn and that this venire was selected under a practice providing an opportunity for discrimination. *Id.; see also Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

**10.** The district court erroneously concluded that the state habeas court's finding that the evidence overwhelmingly proved intent to kill was a question of fact entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d). *See Grizzell v. Wainwright*, 692 F.2d 722, 725 (11th Cir.1982), *cert. denied*, 461 U.S. 948, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983) (suggesting constitutional harmless error is a mixed question of fact and law).

**11.** On three occasions the trial court charged the jury that the law presumes that a person of sound mind intends the consequences of his acts, but that this presumption may be rebutted. The court provided no instruction on how this presumption may be rebutted.

entirely from the jury's consideration, thereby rendering a *Sandstrom* error on the issue harmless. *Id.* at 660. Moreover, the state's principal evidence consisted of Cunningham's confessions. In these confessions, Cunningham stated that he had not intended to kill Crawford; rather, he meant only to knock him out with the wrench, take the money, and run. Although Cunningham did not testify, by introducing these statements into evidence the government placed Cunningham's intent in issue at trial.

The second question in the *Sandstrom* harmless error analysis is whether the evidence presented at Cunningham's trial overwhelmingly established his intent to kill. Medical testimony showed that the victim had been struck in the forearms and head with a pipe wrench at least eighteen times. This testimony suggested that the victim's forearms had been broken while he used them to protect his head and that the blows to the forearms alone would not have caused the victim's death. Lastly, the medical testimony showed that any one of approximately eight blows to the victim's head could have caused his death. The only evidence questioning Cunningham's intent was his statement in his confession that he intended to knock Crawford out but not to kill him.

In cases where this Court has refused to hold a *Sandstrom* error harmless, the defendant has presented substantially greater evidence to support his claim of lack of intent. In *Thomas v. Kemp*, 800 F.2d 1024 (11th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987), the defendant claimed that his drug use prevented him from forming the requisite intent to commit murder. The defendant testified at trial about his drug use and supported his theory of defense with psychiatric testimony on the effect of drugs on the formation of intent. *Id.* at 1026. In *Dick v. Kemp*, 833 F.2d 1448 (11th Cir.1987), the

defendant presented evidence that he was a chronic alcoholic and severely intoxicated at the time of the killing. Moreover, after the trial the defendant learned that he had been drugged by one of his fellow robbers. In light of the evidence that Cunningham struck the victim with the wrench at least eighteen times, with at least eight of those blows directly to the victim's head, we find the *Sandstrom* error to be harmless beyond a reasonable doubt.

### D. Ineffective Assistance of Counsel

■ In his habeas petition before the district court, Cunningham raised fifty grounds to support his contention that he received ineffective assistance of counsel at trial.[12] In his brief, however, Cunningham argued only his contention that his trial counsel were ineffective because they failed to present substantial mitigating evidence during the sentencing phase of the trial.

The district court found no merit to Cunningham's claim that his trial counsel were ineffective during the sentencing hearing.[13] The court noted that Cunningham provided trial counsel with the names of only three persons, his mother, his employer, and his supervisor, who might testify on his behalf. The court found that trial counsel had interviewed these three and presented their testimony during the penalty phase of the trial. Relying on the state habeas transcript, the district court also found that trial counsel had interviewed Cunningham's mother, his employer, the local sheriff and his chief deputy, and the clerk of the superior court and his wife. The district court found that none of these individuals were able to provide trial counsel with the names of anyone who would testify on Cunningham's behalf. The court noted further that Cunningham received two psychiatric evaluations prior to trial and that the state habeas court found that neither

---

**12.** At trial, Cunningham was jointly represented by Murphy M. Holloway and Samuel A. Fowler. We will refer to Holloway and Fowler collectively as "trial counsel."

**13.** In its order, the district court addressed only the grounds raised in Cunningham's brief. In a footnote, however, the court stated that it had considered all the claims raised in Cunningham's petition and found them to be without merit.

contained any mitigating evidence.[14] The court discounted the numerous affidavits from individuals who stated that they would have been willing to testify for Cunningham had they been asked. It noted that none of these individuals came forward at the time of the trial. The court concluded that it would be unreasonable to require trial counsel to interview every member of the community to find those willing to testify.

■ A claim of ineffective assistance of counsel is a mixed question of law and fact subject to plenary review under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). To succeed on such a claim, a defendant must first show that his or her counsel was deficient. *Id.* at 687, 104 S.Ct. at 2064. This performance prong determines whether counsel's performance fell within the range of professionally competent assistance. *Id.* at 688, 104 S.Ct. at 2065. Second, "the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. To satisfy the prejudice prong, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. A proceeding may be unreliable "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

Cunningham contends that, once his trial counsel determined that presenting mitigating evidence would be to his advantage, they had an obligation to investigate, prepare and argue this evidence adequately to the jury. He argues that their decision to present only three witnesses on his behalf, his mother, Eunice Freeman, his employer, Edwin Bentley, and his supervisor, Louis Bentley, and their failure to investigate and present other important available mitigating evidence rendered their counsel ineffective.

This Court has held that:

In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation. *Thompson v. Wainwright*, 787 F.2d 1447, 1450 (11th Cir. 1986), *cert. denied* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987). The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance. *Thompson*, 787 F.2d at 1452. After a sufficient investigation, however, "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation." *Mitchell [v. Kemp]*, 762 F.2d [886] at 889 [ (11th Cir.1985) ] (quoting *Stanley v. Zant*, 697 F.2d 955, 965 (11th Cir.1983), *cert. denied, sub nom.* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)).

*Card v. Dugger*, 911 F.2d 1494, 1509 (11th Cir.1990) (quoting *Lightbourne v. Dugger*, 829 F.2d 1012, 1025 (11th Cir.1987), *cert. denied*, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988)).

■ Although there is evidence that trial counsel might have uncovered additional persons willing to testify on Cunningham's behalf, the state habeas court found that they made a strategic decision to put up "quality" witnesses, *e.g.*, Cunningham's employer and supervisor. Whether or not counsel made an informed tactical decision is a question of fact, *Thomas v. Dugger*, 848 F.2d 149, 151 (11th Cir.1988), and therefore the state court's finding is entitled to deference under 28 U.S.C.A. § 2254 (West 1977). Thus, we do not find error in the decision of Cunningham's trial counsel to present only three character witnesses other than Cunningham during the penalty phase.

---

**14.** Our review of the state habeas court's final order reveals that the district court has overstated the state habeas court's findings. The state habeas court found merely that Cunningham's medical records and psychiatric evalua-

tions produced no evidence *which trial counsel deemed to be mitigating. Cunningham v. Kemp,* No. 5598 slip op. at 18. Cunningham argues that it is this conclusion by his trial counsel which constitutes their ineffectiveness.

We remain troubled, however, by trial counsel's performance in preparing and presenting the witnesses they chose and their failure to present certain significant mitigating evidence, *e.g.*, the evidence that the psychologists at Central State Hospital had determined that Cunningham was mildly retarded. Moreover, trial counsel presented no evidence to the jury on Cunningham's minimal schooling,[15] on his poverty-stricken socioeconomic background, or on the fact his father died when he was five and that as a child he frequently had to live with others besides his mother.

According to the affidavits signed by Mrs. Freeman and Edwin Bentley, trial counsel did not interview Mrs. Freeman until the day of the trial or Mr. Bentley until the eve of the trial. Moreover, according to Mrs. Freeman's affidavit, trial counsel spoke with her for only a few moments and did not speak with her again until she was called as a witness.

The consequence of this minimal preparation is plainly evident. The trial transcript reveals that trial counsel asked Edwin Bentley only six questions. Edwin Bentley's testimony established that he had known Cunningham for approximately fifteen to twenty years, that he had employed Cunningham, off and on, for approximately seven to nine years, that he had never known of Cunningham's getting into any fights at work, and that, prior to the killing, Bentley would have trusted Cunningham with his family, including his young children.

At the state habeas proceeding, trial counsel stressed that they had made a strategic decision to put on "quality" witnesses to speak on Cunningham's behalf. Trial counsel thought that Edwin Bentley's testimony might carry great weight with the jury. In fact, it is safe to conclude that trial counsel likely considered Edwin Bentley to be their most important witness. Yet, trial counsel's minimal questioning of Edwin Bentley resulted in the jury's being deprived of substantial mitigating evidence regarding Cunningham. According to Edwin Bentley's affidavit, he considered Cunningham to be a good worker who sought extra work when it was available. Edwin Bentley stated further that he actually permitted Cunningham to do work around his house and family even when he was not present and that he had no fear that any harm would come to his family.[16] He also stated that Cunningham was working for him when he suffered injuries from an auto accident and that these injuries caused headaches so painful that at times they prevented Cunningham from working. Moreover, trial counsel also engaged in only minimal questioning of Mrs. Freeman and Louis Bentley, the other two mitigation witnesses they had selected.

The only evidence the jury heard of the skull fracture that Cunningham suffered in a car accident in 1973, six years before the killing, was presented by Mrs. Freeman [17]

---

**15.** Cunningham never progressed beyond the fifth grade.

**16.** During the penalty phase, trial counsel did ask Edwin Bentley, "Would you have trusted [Cunningham] with a minor child of yours?" Trial counsel failed, however, to bring to the jury's attention that on more than one occasion Edwin Bentley had in fact left Cunningham with Bentley's family when Bentley was not present and had trusted that no harm would result.

**17.** Excluding the introduction of Mrs. Freeman, the following is the entire direct examination of Mrs. Freeman during the sentencing phase of the trial:

TRIAL COUNSEL: Mrs. Freeman, in reference to your son, can you tell this jury, or would you like to tell this jury, anything concerning his past or——

A. No, I ain't got nothing to tell them about nothing that——no more than about his head, he be bothered with his head a lot on account of that plate that is in his head.

Q. In reference to James' actions, the way that he went about his day-to-day life——

A. Well, are you talking about when he were growing up?

Q. Was he a good boy?

A. Yes, sir, he was good, he ain't never been in nothing until now.

Q. Until now?

A. Yes.

Q. You know of no situation which he was in trouble with?

A. No.

Q. What about his family life, Mrs. Freeman?

and Cunningham[18] only in passing. This injury required doctors to surgically insert a plate into Cunningham's head. As a result of these injuries, Cunningham suffered severe headaches which caused him a great deal of pain and, at times, interfered with his ability to work.[19] Cunningham was supposed to take medication for the headaches, but he did not do so, apparently because of the cost. Thus, while Mrs. Freeman and Cunningham mentioned the plate in Cunningham's head, trial counsel failed to substantiate the existence of this injury or its effects on Cunningham by introducing Cunningham's medical records or Mr. Edwin Bentley's testimony witnessing the headaches. Moreover, trial counsel never referred to Cunningham's head injury during their closing argument, thereby failing to place this evidence squarely in front of the jury. At the state habeas hearing, trial counsel testified that they had asked a neurosurgeon to review Cunningham's medical records with regard to pursuing an insanity defense. There is no evidence that trial counsel asked the neurosurgeon to consider the medical records for the purpose of mitigation.

Finally, trial counsel presented no evidence regarding Cunningham's mental retardation and made no reference to it in their closing argument.[20] At the state habeas hearing, trial counsel conceded that they had not subpoenaed the records from Central State Hospital concerning Cunningham's psychiatric evaluation. Rather, they merely reviewed copies of the records that were made available to them by the district attorney. Trial counsel did not recall that the Central State Hospital personnel had diagnosed Cunningham to be mildly mentally retarded. Accordingly, their decision not to present such evidence cannot be deemed tactical. Accordingly, we find that, in light of the ready availability of this evidence and in the absence of a tactical justification for its exclusion, the failure by trial counsel to present and argue during the penalty phase any evidence regarding Cunningham's mental retardation, combined with their failure to present and argue readily available additional evidence regarding Cunningham's head injury, his socioeconomic background, or his reputation as a good father and worker, fell outside the range of professionally competent assistance. *See Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.1989) (holding that defendant received ineffective assistance of counsel when the failure to present mitigating evidence was not the result of a tactical

A. Well, far as I know, when they come around me, they was getting along fine; but afterward, I don't know.
Q. Do you know whether or not he was a good father?
A. Yes, sir. He worked all the time, far as I know.
Q. In terms of his work, did you have any knowledge about whether he did have a job in January of 1979?
A. I don't even know about that, did he have 'ere one or not. But all I know, he worked. He did try to take care of his children and his home.
Q. How many children does he have?
A. He have two—a little boy and a little girl.
Q. Do you know how old they are?
A. No, sir.
Q. All right, fine.

**18.** The following is Cunningham's entire testimony regarding his headaches and head injury:
TRIAL COUNSEL: Do you have any headaches?
A: Oh, yeah, I have headaches.
Q: What is that from?
A: From a plate in my head. I had a wreck in '72. They pronounced me dead in Washington, but I'm sitting here now.

Q: You have a plate in your head?
A: Yes, and when I was working on the job, one day, well, right after I got out the hospital, I stayed in three months, University Hospital, I had headaches so bad one day my bossman, Mr. Edwin Bentley, he got scared of me and he carried me home. See when my head hurt, my right eye there closes up and goes to running water, I go to gritting my teeth, the pain goes all down in my neck.

**19.** In his affidavit, Edwin Bentley commented on Cunningham's headaches, "He was bothered by severe headaches. I have seen him laid out and hurting so much he bit a plug out of his arm."

**20.** The state trial court referred Cunningham to the Central State Hospital for an evaluation of Cunningham's competency to stand trial. The hospital personnel determined that Cunningham was competent to stand trial. They also determined that Cunningham had a performance IQ of 58 and classified him as mildly retarded.

decision by trial counsel); *Stephens v. Kemp*, 846 F.2d 642, 652–53 (11th Cir.1988) (holding that when trial counsel knew that defendant had previously been admitted into a mental hospital for a few days the failure to present any evidence regarding the defendant's mental capacity or health rendered counsel ineffective); *Armstrong v. Dugger*, 833 F.2d 1430, 1433–34 (11th Cir.1987) (holding failure to present readily available mitigating evidence regarding defendant's socioeconomic background and his retardation at sentencing phase rendered counsel ineffective); *cf. Card v. Dugger*, 911 F.2d 1494, 1511 (11th Cir.1990) (holding that counsel was not ineffective when decision not to present certain background information on petitioner's difficult upbringing was based on sound tactical reasons); *Singleton v. Thigpen*, 847 F.2d 668, 670 (11th Cir.1988) (holding the failure to investigate and present additional mitigating evidence did not render counsel ineffective where petitioner failed to proffer what other mitigating evidence would have been found had such an investigation taken place).

Moreover, the resulting prejudice is clear. As noted above, the only evidence that the sentencing jury received regarding Cunningham's skull fracture was Mrs. Freeman's and Cunningham's passing references. Furthermore, the jury received no evidence regarding Cunningham's mental retardation, his socioeconomic background, his reputation as a good worker, and his positive reputation as a member of his community. The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing the particularized characteristics of the defendant. *Armstrong*, 833 F.2d at 1433 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982)). By failing to provide such evidence to the jury, though readily available, trial counsel's deficient performance prejudiced Cunningham's ability to receive an individualized sentence. *See Stephens*, 846 F.2d at 653–55; *Armstrong*, 833 F.2d at 1433–34.

### E. *Prosecutorial Misconduct*

■ We cannot close our discussion of this case without some comment on the prosecutor's closing argument during the penalty phase of Cunningham's trial.[21] In the course of his closing argument, the prosecutor made numerous statements which we can only describe as outrageous. These statements include his comment that he was "offended" that Cunningham had exercised his Sixth Amendment right to a trial by jury in the guilt-innocence phase of the trial.[22] The prosecutor's comments improperly implied that Cunningham had abused our legal system in some way by exercising his Sixth Amendment right to a jury trial. The prosecutor subsequently questioned whether Cunningham was even entitled to his Sixth Amendment rights.[23] Moreover, in arguing that Cunningham de-

---

21. In his habeas petition to the district court, Cunningham claimed that prosecutorial misconduct during closing argument of the sentencing phase of his trial deprived him of due process in violation of the Fourteenth Amendment. Cunningham did not brief this claim, and the district court did not discuss it in its order. The court did state in a footnote, however, that it had considered each claim raised in Cunningham's petition and found those not discussed also to be without merit. Cunningham generally appealed the district court's judgment and order to this Court, but, once again, did not brief the issue of prosecutorial misconduct.

22. The prosecutor stated:
 [I]t's offensive to me to sit here and I don't say this for any personal reason, but to be in this courtroom having asked for recesses to get my body in shape to try a case for several days, when a man sits up here and tries to mislead you first of all, into believing he's not guilty. That's offensive, to me. That's trifling with the processes of this court. I personally dislike that, and I don't mind publicly saying it, and I will say it the next time I feel it. This system we have is too precious. It took too many lives to bring it here, to let somebody come in here and take his chances on killing a man, robbing a man, trying to escape and then beg and ask the jury, not him himself, but through cross-examination and casting reflections and dispersions on witnesses.... The case here, Ladies and Gentlemen of the Jury, is, "Find me guilty first, and then I'll take the stand and beg you to save my life."

23. The prosecutor stated:
 He's had a trial of people in Lincoln County, some of whom, I believe, knew him before this, he's had the right to have witnesses face. He's had the right to cross-examination. He's had the right to have His Honor charge the

served capital punishment, the prosecutor made numerous appeals to religious symbols and beliefs, at one point even drawing an analogy to Judas Iscariot.[24]

 By these comments and others, the prosecutor improperly appealed to the jury's passions and prejudices. He sought to inflame the jury and to misinform them as to the role that certain fundamental rights guaranteed by the Sixth Amendment play in our legal system and to suggest that Cunningham was somehow not entitled to those rights. A prosecutor may not make an appeal to the jury that is directed to passion or prejudice rather than to reason and to an understanding of the law. *United States v. Rodriguez*, 765 F.2d 1546, 1560 (11th Cir.1985); *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. Unit B Dec.1981), *cert. denied, sub. nom Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). We need not determine whether the prosecutor's improper remarks were sufficiently prejudicial to warrant a new sentencing hearing because, as discussed above, we concur with the district court that the trial court's improper jury instructions during the penalty phase require vacating the death sentence.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's holding that the trial court's instructions during the sentencing phase were constitutionally invalid. We REVERSE the district court on Cunningham's claim for ineffective assistance of counsel during the sentencing phase of the trial. We AFFIRM the district court's ruling on all of Cunningham's other claims. Accordingly, we REMAND to the district court for resentencing.

jury correctly. He's had every right afforded a human being, although sometimes I wonder if they're really entitled to it.

**24.** The prosecutor stated:
How do you know that if you let him go this time it won't be done again? ... You know, Judas Iscariot was a good person, the most trusted of them all and you all know what he did. So the fact that he's a good person and committed only one act, he changed the course of Christianity and he can change the course of civilization.