**UNITED STATES of America**

v.

**Andrew Lee JOHNSON.**

**Crim. No. 91–300–N.**

United States District Court,
M.D. Alabama, N.D.

Feb. 4, 1992.

James Eldon Wilson, U.S. Atty., R. Randolph Neeley, Sp. Asst. U.S. Atty., Montgomery, Ala., for the U.S.

George L. Beck, Jr., Montgomery, Ala. (court-appointed), for Johnson.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Defendant Andrew Lee Johnson has been charged in a two-count indictment with possession of cocaine with intent to distribute it, 21 U.S.C.A. § 841(a)(1), and conspiracy to commit the same, 21 U.S.C.A. § 846. Immediately before choosing the jury for his trial on the morning of January 21, 1992, Johnson asserted a challenge to the jury selection process, claiming that it violated the requirements of the sixth amendment to the United States Constitution, the Jury Selection and Service Act, 28 U.S.C.A. §§ 1861–1878, and the equal-protection component of the fifth amendment to the United States Constitution. Based on the evidence presented during jury selection and later at a hearing held on January 28, 1991, the court concludes that Johnson's challenge must be overruled.

In the Middle District of Alabama, the process for selecting juries in criminal cases is, in general, as follows. The clerk of the court sends out questionnaires to several thousand persons randomly selected, by computer, from a master list the clerk has compiled from lists of qualified voters in the district. From the answers to the questionnaires, the clerk compiles another list consisting of those persons who appear qualified for jury service. For each criminal term, the clerk randomly selects, by computer, from this "qualified list" a sufficient number of persons to generate the juries for that term, taking into account that a number of prospective jurors will fail to appear, be challenged by the parties, or will be excused by the court. The clerk sends out notices to these persons summonsing them to appear in court on a set day.

One hundred forty-three persons were summonsed for jury service on January 21, 1992. Of these 143, eleven were absent and four were excused by the court. Eight juries were to be selected, with the cases called in sequential order. The attorneys trying the first case started at the top of

the list and selected twelve jurors and one alternate, skipping over absent and excused jurors, and exercising their peremptory challenges as they went. The attorneys for the second case engaged in the same process, starting again at the top of list with those persons who had not been selected for the first jury. After the second jury was selected, the succeeding parties did not start at the top of the list, but rather began their jury selection at the point on the list where the previous parties had left off.

When the court reached Johnson's case, which was the sixth or seventh to be called, the jury venire had decreased to approximately 48. The first eight of these 48 were at the end of the jury list and were being considered for the first time, and the remaining 40 were those who, for varying reasons, had been considered but not selected by attorneys in preceding cases. Johnson and the government considered 30 of these 48 persons before they were able to agree on a 13–person jury (12 jurors and one alternate juror); Johnson exercised ten peremptory strikes, the government exercised six, and the court excused one juror for cause. Johnson objects, first, to the fact that in the 48–member pool there were only three African–Americans and only four persons under the age of 30; he objects, second, to the fact that, of the 30–member pool from which his jury was selected, there was only one black and few, if any, persons under 30.

■ A party claiming disproportionate representation of a particular group in a jury selection process must show the following in order to establish a *prima facie* case: (1) that the group alleged to be excluded from venires is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Cunningham v. Zant*, 928 F.2d 1006, 1013 (11th Cir.1991). For equal protection challenges, the party must establish

the same first two elements, and then demonstrate that the venire was selected "under a practice providing an opportunity for discrimination." *Id.*

■ First, although African–Americans are a distinctive group within the community, *Cunningham*, 928 F.2d at 1013, the young are not, *Wysinger v. Davis*, 886 F.2d 295, 296 (11th Cir.1989). Johnson's challenges to the age make-up of the jury pools must therefore be rejected.

■ With regard to his racial composition challenge, Johnson has not expressed any dissatisfaction with the venire as a whole, and he recognizes that African–Americans were randomly dispersed throughout venire. He also does not challenge the manner in which the court selected and called each case for jury selection. Johnson's challenge is, instead, based on two other factors. First, he bases his challenge on the fact that, in the six or seven cases preceding him the attorneys selected a disproportionate number of African–Americans for their juries or, more accurately, did not challenge enough African–Americans; he maintains that this process left him with racially unbalanced pools—the 48–member pool as well as the 30–member pool—from which to choose his jury. Johnson argues that this disparity occurs regularly because defense lawyers want black jurors and because prosecutors are reluctant to challenge African–Americans out of fear of *Batson* challenges. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (equal protection clause forbids prosecutors from challenging potential jurors on account of their race). To cure this "problem," Johnson asks that the court consciously summons extra black jurors so as to help assure that those criminal defendants whose cases are called last on the day of jury selection have a "sufficient" number of black jurors from which to choose.

Second, Johnson bases his claim on the fact that, because black jurors are sometimes clustered and spread unevenly on the jury venire list, all defendants do not have an equal number of black jurors from which to choose. He ask that the court

consciously disperse black jurors in an ordered pattern on the jury venire list so that all criminal defendants can have an equal number of black jurors from whom to choose, irrespective of the order in which the defendants' cases are called for jury selection.

■ Even if Johnson's factual allegations are true, he has failed, for three reasons, to state a violation of federal law. First, the law guarantees a defendant the right to a jury selected from a venire that does not systematically *exclude* distinct groups in the community. *United States v. Green,* 742 F.2d 609, 611 (11th Cir.1984). *See also Cunningham,* 928 F.2d at 1013; *United States v. Rodriguez,* 776 F.2d 1509, 1511 (11th Cir.1985). In *Green,* the defendant objected to her venire on the grounds that no blacks were in the panel. The court rejected her "fair cross section" challenge, stating that:

"Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinct groups in the community and thus fail to be reasonably representative.... Green has not demonstrated that the jury wheels, pools of names, panel, or venires from which the present jury was drawn *systematically excluded* any distinct group in the community, i.e., black people."

742 F.2d at 611 (citation omitted, emphasis in original). Therefore, even if the defendants who selected their juries late in the day tend to receive pools with fewer African–Americans, it would be due to that racial group's *inclusion* rather than *exclusion* in the earlier juries and thus in the overall jury selection process. There has, in short, been no discriminatory exclusion of black persons from the jury selection process.

Second and most fundamentally, a party has no right to a jury of a particular composition. *Green,* 742 F.2d at 611. The laudatory principle behind recent developments in the law of jury selection is to rid the process of all race discrimination, ves-

tiges and all. Johnson's suggestion that the court should intentionally single out black jurors, merely because of the color of their skin, in order to summons more of them for jury duty as well as place them on the jury list in a certain order would offend this principle in the worst way.

Third and finally, Johnson had an equal chance of being first, rather than last, to select a jury. His chances of selecting black jurors were, therefore, the same as those of all other defendants drawing from the venires summonsed periodically from the "qualified jury list". The jury selection process promised, and delivered to, him nothing more than that he would have an equally random chance to select jurors from this list, the composition of which he has not challenged. *Lockhart v. McCree,* 476 U.S. 162, 174, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986) ("The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn") (citation omitted). Johnson was not deprived of his constitutional or statutory rights.

Accordingly, it is ORDERED that defendant Andrew Lee Johnson's challenge to the court's jury selection process be and it is hereby overruled.