CARNES, Circuit Judge,
dissenting:
The twelve men and women who decided whether Lawrence Jefferson should live or die heard only a brief reference to the fact that when he was two years old a car ran over the top of his head, he was taken to the hospital, and “he just barely made it.” The jury heard nothing else about the extent of his injuries and nothing about the devastating effect those injuries had on his life. The jury was not told that he was hospitalized for weeks. That the trauma he suffered permanently misshaped his head, leaving him with a cranial indentation and an abnormally enlarged skull caused by the pressure of cerebrospinal fluid. That it resulted in frontal lobe and neurological damage, which had a profound and lifelong impact on his behavior. That it caused learning disabilities, emotional instability, diminished impulse control, and intermittent outbursts of rage. That it led to impaired judgment and paranoia. That the neurological damage resulting from the head injury deprived him of a normal ability to premeditate, deliberate, distinguish right, from wrong, and act rationally. That he had substantially limited or no control over the abnormal behavior caused by the brain damage he suffered.
The jury was told nothing about the impact of Jefferson’s childhood injury on his life and his behavior. As far as the jury knew, Jefferson did not suffer from brain damage or neurological impairment; he had no organic disorders or pathologies; his emotional stability, impulse control, and judgment were perfectly normal; he could premeditate, deliberate, distinguish right from wrong, and act rationally as easily as the next person. The jury had that misleading picture of Jefferson’s moral culpability because the most important *1312 mitigating circumstances were withheld from it.
The reason the jury did not know the critical facts about Jefferson’s organic brain damage and its devastating effects on him is that his trial counsel failed to request a neuropsychological examination. They failed to request one even though they knew from what Jefferson told them, from the statements he made to the detectives, and from what his mother said that Jefferson had suffered a serious head injury as a child when he was run over by a car. They failed to request an examination even though they were advised to do so by Dr. Gary Dudley, the psychologist who had seen Jefferson. His report to them stated:
One possibility that could not be explored because of his incarceration has to do with the sequelae to head injury experienced during childhood. In my opinion, it would be worthwhile to conduct neuropsychological evaluation of this individual to rule out an organic etiology.
Neuropsychological examinations were “available and routine at the time of Mr. Jefferson’s trial,” and “it is undisputed that the testing ... could have easily been performed by available mental-health professionals in the Atlanta area prior to [Jefferson’s] sentencing,” Dist. Ct. Habeas Corpus Order, R. 146 at 81-82 (hereinafter “Dist. Ct. Order”). The State does not contend that a motion requesting the examination would have been denied. All the attorneys had to do was ask for one.
The attorneys’ main excuse for not asking is that when Stephen Schuster, lead counsel for Jefferson, called Dr. Dudley about his report he discouraged Schuster from seeking a neuropsychological examination. Schuster testified: “He basically said it may be a waste of time because the rest of the report ... said that [Jefferson] was non psychotic, that he was intelligent, he had a fairly high IQ.... ”[1] According to Schuster, Dr. Dudley told him Jefferson was “just a criminal.”
Dr. Dudley submitted an affidavit adamantly denying that he had ever said anything of the sort to Schuster or to anyone else. Dr. Dudley insisted that it had always been his expert opinion “that neuropsychological testing was necessary” and that he “meant it.” He swore: “I never, before or after that report, suggested to [Jefferson’s attorneys] that such an evaluation was not necessary or that it would not be worthwhile.” The state collateral court credited the testimony of Jefferson’s attorney over that of Dr. Dudley, and we are obliged to accept that credibility determination, see Ranee v. Zant, 981 F.2d 1180, 1183 n. 3 (11th Cir.1993), although there are reasons to doubt it.
Taking everything that Schuster says as true, his representation still falls outside of the wide range of reasonably effective assistance. Schuster knew that Jefferson had suffered a serious head injury when he was a child, that his head had actually been run over by a car. He had a transcript of an interview in which Jefferson referred to the injury, he had been told about the injury by Jefferson’s mother, and he had Dr. Dudley’s report referring to the injury. Schuster also knew that in his written report Dr. Dudley had recommended a neuropsychological examination to check for organic brain damage resulting from the head injury. Yet Schuster *1313 did not bother to file a motion requesting the examination because of some informal remarks Dr. Dudley made over the telephone.
Schuster has never explained why he thought Dr. Dudley, after issuing a formal report recommending an important examination to check for organic brain injury, would pivot 180 degrees and take back that recommendation when he spoke informally with Schuster over the phone. The facts Dr. Dudley allegedly mentioned to Schuster during their telephone conversation are all facts he knew at the time he submitted his written report recommending the examination. Indeed, they are all set out in the same .report that contains the recommendation. Yet, from all that appears in the record, Schuster never even asked Dr. Dudley why he would write one thing in the report and say exactly the opposite thing over the telephone. See Dist. Ct. Order at 85 (“There is no indication, however, that [Jefferson’s] trial counsel ever sought a clear-cut explanation from Dr. Dudley as to how or why he went from stating his opinion in a written report that it would be worthwhile to conduct a neuropsychological evaluation to stating orally that such an evaluation would likely be a waste of time and that [Jefferson] was ‘just a criminal.’ ”).
Knowing that his client had suffered a serious head injury as a child and that a psychologist had issued a formal report recommending further testing to determine if the injury had caused organic brain damage, no reasonable attorney would have let the matter drop because of informal remarks made to him during a telephone conversation. Not without a convincing explanation for the change of mind, and there was none. Absent any explanation for the about-face, any reasonable attorney would have filed a motion for a neuropsychological examination, citing the head injury and the recommendation in the report. Schuster’s failure to do so was deficient performance. See Dist. Ct. Order at 85 (“[N]o competent lawyer would have abandoned an investigation into potential mitigating evidence based on the oral opinion of a mental health expert that the defendant was ‘just a criminal,’ particularly when that mental health expert previously had provided a written expert report explicitly stating that it would be worthwhile to conduct further testing to determine whether the defendant suffered from ‘organic etiology’ or brain damage.”).
This case is similar to Cunningham v. Zant where we found trial counsel had rendered ineffective assistance at the sentencing stage for several reasons, one of which was their failure to adequately develop and present the facts concerning the petitioner’s head injury. 928 F.2d 1006, 1016-19 (11th Cir.1991). Cunningham had been injured in a car accident six years before the crime and as a result of the accident had a steel plate in his head. Id. at 1017-18. He and his mother testified at the sentence stage about that accident, telling the jury about his being hospitalized for three months, having a steel plate put into his head, and suffering from severe headaches. Id. at 1018-19 & nn. 17 & 18. We found counsel ineffective in Cunningham partly because of their failure “to substantiate the existence of this injury or its effects on Cunningham by introducing Cunningham’s medical records or [his boss’] testimony witnessing the headaches.” Id. at 1018. Our conclusion that they were ineffective was also based on their failure to mention the head injury in their closing argument, “thereby failing to place this evidence squarely in front of the jury.” Id.
Those same failures happened here, but to an even greater extent. Jefferson’s head injury was mentioned briefly during his mother’s testimony, but when Jeffer *1314 son himself testified he was not asked anything about it. No medical records were introduced to substantiate the injury. The effects it had on Jefferson were not mentioned by any witness. And defense counsel did not even allude to the subject in their closing arguments. Jefferson, like Cunningham, received ineffective assistance of counsel.
In concluding that Jefferson’s trial counsel were not ineffective, the majority opinion lists “about 30 motions” that they filed before and during the trial. Majority Op. at 1293 n. 4. Virtually all of those motions relate solely to the guilt stage, and all of them are beside the present point. Adequate, or even stellar, performance in regard to one aspect of the trial does not bar a conclusion that counsel performed ineffectively in another regard. The cases are legion in which an attorney’s performance has been found to be effective at the guilt stage and ineffective at the sentence stage. E. g., Williams v. Taylor, 529 U.S. 362, 395, 120 S.Ct. 1495, 1514, 146 L.Ed.2d 389 (2000); Brownlee v. Haley, 306 F.3d 1043, 1067 (11th Cir.2002); Collier v. Turpin, 177 F.3d 1184, 1196 n. 17 (11th Cir.1999) (“Our finding that Collier has not demonstrated that his counsel were ineffective in the guilt phase does not affect our examination of their performance in the sentencing phase.”); Baxter v. Thomas, 45 F.3d 1501, 1511 n. 25, 1512 (11th Cir.1995); Cave v. Singletary, 971 F.2d 1513, 1519-20 (11th Cir.1992); Blanco v. Singletary, 943 F. 2d 1477, 1498 (11th Cir.1991); Stephens v. Kemp, 846 F.2d 642, 652 (11th Cir.1988). And relief is due if an attorney has rendered ineffective assistance in one aspect of the sentence stage even if his performance in other aspects of it was adequate. See Rompilla v. Beard, 545 U.S. 374, 388, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (rejecting an argument that defense counsel’s efforts to find mitigating evidence by' other means, including the assistance of three mental health experts, excused them from looking at a file relating to a prior conviction they knew would be introduced as an aggravating circumstance). The focus of ineffective assistance of counsel claims is specific not general. See Horton v. Zant, 941 F.2d 1449, 1461 (11th Cir.1991) (We “evaluate[] an attorney’s performance during discreet portions of a trial without regard to the attorney’s performance at other points during the trial.”).
The majority takes the position that defense counsel’s failure to ask for a neuropsychological examination was based on a reasonable decision to follow a residual doubt strategy instead. That position cannot withstand scrutiny for several reasons. First, while “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,” those made after “less than complete investigation” are reasonable only to the extent that reasonable professional judgment supports the limitations on investigation. Strickland v. Washington, 466 U.S. 668, 690-91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); accord Wiggins v. Smith, 539 U.S. 510, 527-28, 123 S.Ct. 2527, 2538-39, 156 L.Ed.2d 471 (2003) (finding ineffective assistance because “counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible”); Ford v. Hall, 546 F.3d 1326, 1333-34 (11th Cir.2008) (holding that in evaluating the reasonableness of an investigation into mitigating circumstances “a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further”) (internal citations and quotation marks omitted); Williams v. Allen, 542 F.3d 1326, 1337 (11th Cir.2008) (holding that “the decision to limit an investigation must flow from an informed judgment”) *1315 (internal citations and quotation marks omitted).
Here, defense counsel’s investigation into the effects of the serious head injury Jefferson suffered as a child was not just “less than complete,” it was virtually nonexistent. Reasonable professional judgment did not support their failure to file a motion requesting a neuropsychological examination. The decision that followed from that failure was not based on strategy but on ignorance, not only about whether Jefferson was brain-damaged but also about how it might affect his behavior.[2] See Dist. Ct. Order at 84 (“[T]he decision not to present mental health evidence can hardly be described as strategic, since trial counsel was not aware of the mental health evidence that might have been available.”). Making decisions based on ignorance is not professionally reasonable. See Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) (citing a long line of decisions showing that “our case law rejects the notion that a ‘strategic’ decision can be reasonable when the attorney has failed to investigate his options”) (internal citations and quotation marks omitted).[3]
There is a second reason that following a residual doubt strategy at the sentence stage does not make defense counsel’s failure to request a neuropsychological examination in search of mitigating circumstances reasonable. The attorneys did not choose to rely on residual doubt instead of presenting mitigating circumstances. At the sentence stage they put on six witnesses, including Jefferson himself, to testify about his life history, his service in the Navy, and his work history^-testimony emphasizing his hard life; some of his good qualities, and his family relationships. Through the testimony of Jefferson’s mother they also brought out—although almost in passing—the fact that he had been injured when he was two years old by a car that ran over his head.[4] If the existence of that kind of head injury is not inconsistent with a residual doubt strategy, the fact that it had resulted in permanent and profound organic brain damage is not either.
*1316 This case is like Wiggins. In that case defense counsel testified that they had made a reasonable strategic decision to focus the jury’s attention on the defendant’s role in the crime instead of presenting the defendant’s difficult life and history as mitigating circumstances. 539 U.S. at 517, 123 S.Ct. at 2533. The Supreme Court rejected that justification for counsel’s failure to perform a more thorough investigation. It did so because “[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel’s conduct” by showing that the failure to investigate was not the result of reasoned strategic judgment. Id. at 526, 123 S.Ct. at 2537. "What the record showed in Wiggins was that “[f]ar from focusing exclusively on petitioner’s direct responsibility, then, counsel put on a halfhearted mitigation case.” Id., 123 S.Ct. at 2538. Likewise, the record in this case shows that far from focusing exclusively on a residual doubt strategy, counsel put on a halfhearted mitigation case. Here, as in Wiggins, the decision not to investigate further into the mitigating circumstances stemming from the childhood head injury was not reasonable. It was unreasonable.
There is a third reason that pursuit of a residual doubt strategy does not excuse trial counsel’s failure to investigate Jefferson’s brain damage and its effect on his life and behavior. Trial counsel did not actually pursue a residual doubt strategy, at least not one worthy of the name. The state collateral court never found that a residual doubt strategy was actually used. The majority says one was, but the record tells another story.
As I have already pointed out, trial counsel called Jefferson and five other witnesses to testify at the sentence stage. None of them gave any testimony relevant to residual doubt. The jury heard Jefferson testify about his life and heard him deny that he was guilty of some of the prior crimes on his record. But they did not hear him deny that he had robbed and murdered the victim in this case, Ed Taulbee. Conspicuously, Jefferson said nothing at all about that. Trial counsel never asked the most important question to a residual doubt defense: Did you do it? Their failure to ask that question is inconsistent with the majority’s theory that a residual doubt strategy trumped the need to investigate mitigating circumstances based on the serious head injury that Jefferson had suffered. A residual doubt strategy in which the defendant takes the stand at sentencing but does not deny committing the crime is a strategy not pursued.
Jefferson’s two attorneys divided the closing argument at the sentence stage. Marc Celia argued first. The majority opinion states that he “emphasized during the closing argument of the penalty phase that there were no eye witnesses to the crime, no guilty plea, and ‘no evidence of any consciousness of guilt.’ ” Maj. Op. at 1296. The record shows, however, that Celia did not emphasize any of that. He merely mentioned it. He talked about the evidence of guilt in only four sentences, with a lead in of three more, in his twenty-one pages of closing argument. Any weaknesses in the case against Jefferson were not emphasized. What was emphasized was the need for mercy despite guilt.
The bulk of Celia’s closing argument was about mitigating circumstances that the jury should find despite Jefferson’s guilt. Celia talked about how Jefferson grew up in unfortunate circumstances “in the ghetto” and mostly without a father. Celia asked the jury to “[rjealize that you are looking at someone who grew up in an entirely different environment than most of you have experienced” and to “realize that you are looking into a different culture.” He urged the jury to consider that *1317 the people with whom Jefferson associated had been a bad influence on him. Celia also pointed out Jefferson’s positive qualities, such as his “good work record” and his desire to provide for his family.
Celia attempted to explain Jefferson’s history of getting into trouble this way:
It’s rough growing up in a house without that fatherly influence, even putting aside the problems with worrying about your income, worrying about your landlord evicting you, worrying about your mentally retarded brother and your sisters, taking care of them while your mom is in high school.
He had problems to deal with. And he did the best he could.
You know, it’s very difficult for us to sit in judgment on someone whose burdens we haven’t had to bear. Each one of us has been put on this life, and we are destined from the day we are put here to travel our own paths, take our own way through life’s travels and tribulations.
Lawrence has had a rougher path than any of us.
[Respondent’s Ex. 25: 1395] Celia asked the jury “not to make Lawrence Jefferson’s mama and his children victims, too.” He urged the members of the jury to “look in [their] hearts, find some understanding, some love, some compassion for Lawrence.” He invoked religious references and asked the jury to have “compassion and mercy.” None of those arguments had anything to do with residual doubt. All of them would have been entirely consistent with evidence of conduct-altering brain damage caused by a serious head injury.
Celia’s mercy-despite-guilt strategy is illustrated by his use of popular culture analogies. He told the jury about what he termed “the Star Wars philosophy,” which uses Princess Leia and Darth Vader as symbols of pure good and pure evil. The world, Celia argued, is not that simple and “nobody is Dar[th] Vad[e]r in the real world.” He argued instead that we all have the “capacity for both good and evil,” concluding: “In short, we human beings are all products of the combined forces of our heredity and our environment. And we don’t have very much control over either one of them.”
Celia’s remarks moved from Star Wars to How the Grinch Stole Christmas. He argued that the Grinch story illustrated that “[w]hen you change for the better, when we take mercy on someone, we gain strength.” Celia also talked about the children’s toy “Fearless Fotog,” a superhero who has the power to drain the evil out of creatures by taking pictures of them and transferring the evil onto his film. He noted that the superhero was created by a twelve-year-old boy who believed that “there is good in all of us.” He asked the jury to separate the good from the bad in Jefferson and have mercy on him.
The reason Celia talked at length about Star Wars, How the Grinch Stole Christmas, and “Fearless Fotog” is not that they supported a residual doubt strategy; they had nothing to do with residual doubt. Instead, they all supported Celia’s mercy-despite-guilt strategy. The abundant mitigating circumstances that Celia and his co-counsel could have offered if only they had asked for a neuropsychological examination would have been entirely consistent with that strategy.
Not only did Celia’s remarks fail to carry along a residual doubt argument, he actually threw the possibility of residual doubt under the mercy bus. The only fleeting references to the evidence against Jefferson came early on in Celia’s remarks, but after talking at length about why the jury should show him mercy, Celia told the jury this near the conclusion of his argument:
*1318 You know, Lawrence’s background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity, and ya’ll found that.
But aren’t we as a society better than that? Don’t we expect more of ourselves? You folks are better people than Lawrence is right now. We trust you to be more just than he was.
[Id. at 1396] Those remarks concede that Jefferson killed the victim. They are inconsistent with a residual doubt strategy, which may explain why the state collateral court never found that counsel had such a strategy.
Schuster also made a closing argument to the jury, although it was only about one-fourth the length of Celia’s. Schuster, like Celia, made a passing reference to the possibility of doubt: “Death is final. There is no margin of error. You find a man guilty beyond a reasonable doubt, but that’s not all doubt.” [Id at 1401] But Schuster, like Celia, essentially threw away any residual doubt argument by telling the jury:
Now, as [the prosecutor] said in his argument, you are not here to determine guilt or innocence. You have determined that. It is behind you. You have made your determination.
As an officer of the court I have to abide by it and I have to live by it. And as Marc [Celia] said, though, the issue you have now is which of two very, very severe sentences you give.
[Id.] And Schuster, like Celia, spent almost all of his time arguing for mercy despite guilt.
Schuster told the jury that the death penalty is reserved for the “most heinous situations” and stressed that under Georgia law the jury was free to return a life sentence for any reason or for no reason at all. He emphasized the hardships of Jefferson’s upbringing as the basis for mercy. The following is a fair sample of his remarks:
I am not going to come before you and say because he grew up among roaches and rodents he is not responsible for his acts. Lawrence Jefferson is responsible for his acts.
But Lawrence Jefferson is not responsible for that person as much as that person who grew up in East Cobb or Dunwoody or West Cobb.
We, or you, because you are a final arbiter of this case, have to decide whether or not to show mercy. You have to show it, decide whether or not to show mercy. You have to show it, decide sitting there, knowing that when this is all over you are going back to your nice home and your families, whether to show mercy.
People do break out of their barrell [sic] of poverty. People do break out of that cycle of poverty. They are the exception rather than the rule. They do go to college and they have careers. They are the exception.
Lawrence Jefferson’s predecessors grew up in poverty, and Lawrence Jefferson’s children will grow up in poverty, and their children’s children will grow up in poverty.
Maybe we as a society have failed them. I don’t know. Lawrence Jefferson failed himself.
But we should show him mercy. You should show him mercy. And I beseech you to show him that mercy and to sentence him to life imprisonment.
[Id. at 1403-04] So, after telling the jury that the question of guilt or innocence “is behind you,” Schuster, like Celia, argued for mercy despite guilt.
The point is that in a combined twenty-seven transcribed pages of argument Jefferson’s attorneys made only two passing references to possible weaknesses in the *1319 state’s case. One counsel acknowledged that the issue of guilt was closed while the other conceded that Jefferson had committed the murder, stating that his “background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity.” [Id. at 1396] A residual doubt strategy that concedes the defendant murdered the defenseless victim is not a strategy at all. In the proper circumstances residual doubt can be a strong argument for a life sentence. But these are not those circumstances and the argument, if made at all, was not effectively made.
Given that Jefferson’s head was run over by a car when he was a child, it was unreasonable to abandon an investigation into organic brain damage as a source of mitigating circumstances in favor of a throw-away residual doubt argument—especially one that actually was thrown away in closing argument. Showing that Jefferson suffered from organic brain damage which had a profound and lifelong impact on his behavior, causing him all kinds of emotional and behavioral problems and leaving him with impaired judgment and diminished impulse control, would have fit perfectly into counsel’s mercy-despite-guilt arguments. The best evidence to support a mercy argument is .that, through no fault of his own, Jefferson had a damaged brain that deprived him of a normal ability to premeditate, deliberate, and distinguish right from wrong and that caused him to behave abnormally. But trial counsel’s unreasonable failure to file a motion requesting a neuropsychological examination deprived Jefferson of all that mitigating evidence.[5]
*1320 The majority opinion does not reach whether the failure of counsel to request a neurological examination was prejudicial to Jefferson. I will. Georgia law mandates a life sentence unless the jury unanimously agrees on death. Hill v. State, 250 Ga. 821, 301 S.E.2d 269, 270 (1983); Miller v. State, 237 Ga. 557, 229 S.E.2d 376, 377 (1976). Because of that, the measure of prejudice is whether “there is a reasonable probability that at least one juror would have struck a different balance” of aggravating circumstances and mitigating circumstances. Wiggins, 539 U.S. at 537, 123 S.Ct. at 2543. Here there is that reasonable probability and more. The results the examination would have produced are summarized in the opening paragraph of this opinion, and so far as the record shows they are not disputed. See Dist. Ct. Order at 91 (noting that Jefferson “has presented a compelling and unrebutted case that he suffers (and suffered) from organic brain damage, a dysfunction that affected his cognitive ability and his ability to conform his actions”); id. at 87 (referring to the “powerful mitigating evidence regarding [Jefferson’s] brain damage”). On this record depriving the jury of all that strong mitigating circumstance evidence does not just undermine confidence in the death sentence but substantially undermines it.
As the district court explained, “[b]e-cause of counsel’s omissions in this case, the jury was deprived of the singularly most powerful explanation for the crime— [Jefferson] suffered from organic brain damage that impaired his judgment and his ability to control his behavior.” Id. at 89. “The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant,” and by failing to provide the jury with evidence about the effects of Jefferson’s head injury, trial counsel “prejudiced [the petitioner’s] ability to receive an individualized sentence.” Cunningham, 928 F.2d at 1019. The prejudice question is not even close to being close.
I have laid out the reasons for concluding that counsel rendered ineffective assistance as though it were an issue for us to decide anew. And it is. This is one of the few remaining cases in this circuit that were filed before the effective date of the AEDPA. For that reason, the AEDPA provisions do not apply to it. Woodford v. Garceau, 538 U.S. 202, 207, 123 S.Ct. 1398, 1401-02, 155 L.Ed.2d 363 (2003). We do not owe the state court decision on the ineffective assistance of counsel issue substantial deference, or any deference at all. We have a duty to decide the issue de novo. Huynh v. King, 95 F.3d 1052, 1056 (11th Cir.1996).
The question is not whether, applying Supreme Court precedent, one reasonably could conclude that counsel performed effectively in investigating mitigating circumstances even though they failed to request a neuropsychological examination of Jefferson. The question is simply whether on independent, de novo review, we should conclude that the failure to request an examination amounted to ineffective assistance of counsel. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007) (“AEDPA, however, changed the standards for granting federal habeas relief.... The question under AEDPA is not whether a federal court believes the state court’s determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.” (footnote omitted)); see also Huynh, 95 F.3d at 1056 (ineffective assistance is a mixed question of fact and law subject to de novo review); Waldrop v. Jones, 77 F.3d 1308, 1312 (11th Cir.1996) *1321 (same); Oliver v. Wainwright, 782 F.2d 1521, 1524 (11th Cir.1986) (same). The correct answer to that question is the one the district court gave when it conditionally granted habeas relief as to the sentence.
Because Jefferson beat a man to death with a tree limb in the course of robbing him, the law demands that he suffer one of two severe punishments: life imprisonment or death. But the law also demands that he have a fair chance to persuade a jury that the less severe punishment is enough, and that requires effective assistance of counsel. Because Jefferson did not have effective assistance of counsel at sentencing, he has not yet had his fair chance. I would affirm the grant of relief.

. Schuster’s testimony that Dr. Dudley told him that the report described Jefferson as being intelligent with "a fairly high IQ” is inconsistent with the report itself. The report states that Jefferson’s IQ is 100, which it correctly describes as only "the middle of the average range.” As for Jefferson not being psychotic, the absence of psychosis in no way rules out organic brain damage. [Respondent’s Ex. 40: 258].

. Both attorneys testified in the state collateral hearing that they did not know how this type of brain damage affects a person, Schuster's four-word answer to the relevant question speaks volumes:
Q. So from your experience, you couldn’t tell me how it affects a person ... ?
A. I’m not a psychologist.
[Respondent's Ex. 39: 211]

. The majority opinion, without much enthusiasm, suggests that filing the motion "would have come with several costs” and “may have hampered the ability of Jefferson’s counsel to work on establishing his innocence.” Majority Op. at 1305-06. Hardly. All that it would have taken is a simple, short motion informing the court of Jefferson's serious childhood head injury and attaching a copy of Dr. Dudley's report. Given the fact that counsel filed "about 30 motions” in the case, id. at 1293 n. 4, one more could scarcely have derailed preparation for the guilt stage. Attorneys who took the time to file, as these did, a "motion to transfer jurisdiction of the case to federal district court,” id., surely had time to file a motion to determine the effects that a serious head injury had on their client and his conduct.
Besides, we have never excused subpair preparation for the sentence stage on the ground that counsel was busy getting ready for the guilt stage. See Cave, 971 F.2d at 1519 (finding ineffective assistance at the sentence stage where counsel had spent all of her time and effort preparing for the guilt stage); Blake v. Kemp, 758 F.2d 523, 533 (11th Cir.1985).

. Q: Now, when Lawrence was young, was he involved in any sort of accident?
A: Well, he had a car accident when he was two years old. A car ran over his head, the top of his head
Q. What happened because of that? Did he have to go to the hospital?
A: Yes, he did, was in the hospital, and he said, they said he just barely made it.
[Respondent's Ex. 25: 1264]

. In footnote 9 the majority opinion itemizes six grounds for its decision that the failure to request a neuropsychological examination was good strategy. Using the same numbers, this is my response: (1) Counsel’s own experience and advice from seasoned capital defense attorneys played no role in their failure to request an examination. Neither counsel ever suggested that he had any experience with such examinations or with brain-damaged clients in the past, and no seasoned capital defense attorney would have advised them not to look for organic brain damage when their client had suffered a serious head injury as a child. (2) Any weaknesses in the case against Jefferson were irrelevant in view of the fact that counsel did not actually pursue a residual doubt strategy at the sentence stage. (3) Dr. Dudley's written report could not have led counsel to believe that a neuropsychological examination would be a waste of time because it explicitly recommended one. (4) That Jefferson was helpful and always cooperated in building a defense is not inconsistent with brain damage. The statement that Jefferson "was 'always very calm and always extremely helpful' ” overlooks the part of Dr. Dudley’s report about what happened when he went to the jail to continue with testing that he had begun the day before: "Mr. Jefferson became agitated and disorganized in his behavior, berating me for not having made an appointment with him, and insisting that I come back another day. I discussed with him the possibility that his failure to cooperate would not be in his best interests, but he was adamant in refusing to work with me at that time.” Jefferson later explained to Dr. Dudley, "I get that way sometimes, man.” [Respondent’s Ex. 40: 372] (5) Adamant insistence on innocence is not at all inconsistent with brain damage. That insistence does, however, make even more inexplicable counsel’s decision to have Jefferson testify at sentencing without asking him if he was innocent. (6) Presenting evidence of brain injury at sentencing would not have amounted to "switching defenses” any more than their presenting all of the life history, hardship, and character evidence did. And presenting evidence that Jefferson suffered from serious organic brain damage would not have implicitly admitted guilt to any greater extent than the evidence that was submitted about his poverty and hard life. Not only that, but in making their mercy argument counsel explicitly admitted guilt. Celia argued that "Lawrence's background, his life experience, has caused him to strike out at a defenseless person, such as Ed Taulbee, that he killed without necessity,” and he used that as a reason the jury should show Jefferson more mercy than he had shown Taulbee. Exactly the same reasoning could *1320 have been used to argue serious brain damage as a powerful mitigating circumstance.